ALEXANDER GILTNER, v. SAMUEL G. RAYL AND CATH-
ERINE RAYL, Appellants; A. C. CREMER, Intervener.

**Specific Performance:** DELAY OF VENDEE. Plaintiff refused land
unless a certain quitclaim deed was furnished by defendant.
It could not be got, and plaintiff being so informed declined the
land and was tendered his earnest money. He asked a few dol-
lars more for damages, which was refused. About two months
later plaintiff demanded the earnest money and was refused.
Later plaintiff tried to buy the land without reference to the quit-
claim deed and defendant renewed a mortgage which the plaintiff
had agreed to assume in the original contract. Seven months
later, the land having greatly risen in value, plaintiff insisted
upon a completion of the original agreement and was refused.
*Held*, the contract was abandoned and it was error to decree
specific performance.

*Appeal from Wapello District Court.*—HON. J. C.
MITCHELL, Judge.

MONDAY, DECEMBER 17, 1894.

Suit in equity for the specific performance of a con-
tract to convey real estate. Decree for plaintiff, and
defendants appeal.—*Reversed.*

*Wm. McNett* for appellants.

*W. H. C. Jaques* for appellee.

Deemer, J.—In the latter part of February, A. D.
1890, the plaintiff and defendant, S. G. Rayl, entered
into an oral contract for the purchase and sale of one
hundred acres of land lying in Wapello county, at the
agreed price of two thousand five hundred dollars. The
plaintiff paid the defendant the sum of ten dollars to
bind the bargain, was to assume a mortgage of one
thousand two hundred dollars upon the land, pay one

thousand dollars in cash at the time the deed was executed, and the remainder of the purchase price in June, 1890.   The defendant represented that he had good title, and was to execute a warranty deed for the premises.   These concurrent acts were to be performed the latter part of February.   Pursuant to contract, the plaintiff and defendant met in the city of Ottumwa on the twenty-eighth day of February, 1890, for the purpose of consummating the deal.   Defendant averred his willingness to make the deed upon plaintiff's fulfilling his part of the contract, but plaintiff refused to pay the consideration, because of an alleged defect in the title.   It appears from the testimony that S. R. Cremer, one of the defendant's remote grantors, at one time owned the land in question; that he made a deed to the premises to his son, A. C. Cremer, November 5, 1879, which was acknowledged on April 10, 1880, but not recorded until August 1, 1885; that for some years prior to April 30, 1880, S. R. Cremer had been a widower, and that on this last-named date he married his second wife. It also appears that, prior to the purchase of the land, his (plaintiff's) son had married a daughter of the second Mrs. Cremer (the child of a former husband), and that plaintiff was informed before he made the purchase of the land, either by his son or by Mrs. Cremer, that the deed from the senior Cremer to his son had never been delivered, and was fraudulent as to her, and that she was claiming some interest in the land.   This is the defect in the title of which plaintiff complained, and, after some discussion between the parties, plaintiff refused to take a warranty deed from defendant and his wife to the land, and refused to complete his part of the contract unless defendant would obtain a quitclaim deed to the land from Mrs. Cremer.   The plaintiff said to defendant that, if he (defendant) would get a quitclaim deed from Mrs.

Cremer, he would still take the land. Defendant said he thought it was no use to try, but that he would see if he could get one. The parties then went to a bank to see about some money that plaintiff had agreed to take of the bank, and defendant paid the interest on the money for another month. At the bank plaintiff remarked that he did not think that he ought to be held for anything, and defendant replied he did not want to hold him for anything; that he would pay the interest on the money at the bank, which would give him time to make arrangements to pay it. Defendant attempted to get a quitclaim deed from Mrs. Cremer, but in this he failed. After his unsuccessful attempt to get the deed, defendant went to plaintiff and told him of his failure, and asked if he would accept any other kind of title, and plaintiff refused to take any other. Defendant then wrote out a check for the ten dollars plaintiff had paid him, and offered to return it to the plaintiff. Plaintiff made no objections to the form of the check, but wanted a few dollars as damages for the trouble and expense he had been to, about the purchase of the land. This defendant refused to give, because he claimed that he had a good title to the land, and that plaintiff was at fault in not accepting it. Thus matters stood until about the first of April, when the parties met again, at which time plaintiff demanded of defendant the ten dollars paid on the land, and defendant at that time refused to return it, claiming that plaintiff had forfeited it because of his failure to take the land. So far the parties are in substantial accord regarding the transaction. But there is a dispute about what occurred at this last meeting. Plaintiff claims that, when defendant refused to return the ten dollars he remarked that, if he (defendant) kept the ten dollars, he (plaintiff) would hold the land; while defendant contends that both agreed the title was perfectly

good, and that, in response to a question as to whether
he-was going to give the money back, he said: "I will
see about it. I think you forfeited the money when you
backed out and refused to take the land,"—to which
plaintiff replied: "Well, if you won't give it back to
me, I will just give it to you." Defendant also says
that, as plaintiff "rode past, he said something about
me holding the money. I understood it that, I wasn't
positive what he said. Consequently, I didn't make
any answer." Some time in the fall, plaintiff asked
defendant how much he would take for the land, plaint-
iff to settle with Mrs. Cremer, and defendant remarked
he would take thirty dollars an acre. Thus matters
stood until after the death of Mrs. Cremer, which
occurred about November 25, 1890. When, on the
twenty-sixth day of December, plaintiff went to defend-
ant and said he was ready to comply with the contract,
defendant remarked, "What contract," and plaintiff
says, "In regard to that land," and defendant retorted:
"There is no contract in regard to that land. You
backed out, and there is no contract in regard to it,"—
to which plaintiff replied, "There was." This closed
the negotiations, and this suit followed. The land had
advanced in value from three dollars to five dollars per
acre while these negotiations were going on.

Much testimony *pro* and *con*, was taken on the
question as to whether there was a delivery of the deed
by Cremer to his son before his second marriage, but in
the view we take of the case it is not necessary to deter-
mine whether it was so delivered or not. It is more
than likely that the plaintiff, in view of the claim made
by Mrs. Cremer, was not compelled to take the land
until her claim was disposed of. The presumption, no
doubt, is that the deed was delivered when·acknowl-
edged; but there is testimony that the deed was never
delivered. See *Moore v. Williams*, 115 N. Y. 586, 22 N. E.

Rep. 233; Beach, Mod. Eq. Jur., section 608. However, we cannot rid ourselves of the thought that there was a mutual rescission and complete abandonment of the contract by the parties; and that but for the death of Mrs. Cremer, and the advance in the value of the land, the plaintiff would not be insisting upon the contract. It seems clear to us that, after defendant failed to get the deed from Mrs. Cremer, both parties regarded the contract at an end, and that neither intended to insist upon it thereafter. The question between them seemed to be settled which one was in fault; plaintiff first claiming that he was entitled to the earnest money with some small damages, because defendant was in fault, and defendant thereafter insisting that it was his, because plaintiff had broken the contract. The complete abandonment of the contract seems to have been recognized by both parties. Plaintiff tried to enter into a new contract of purchase with defendant, subject to Mrs. Cremer's rights; and defendant went to the trouble and expense of renewing a mortgage upon the land, which the plaintiff was to assume the payment of. It is important to notice, too, that, while matters were in this condition, the land advanced from three hundred dollars to five hundred dollars in value; and the equities, under such circumstances, ought clearly to preponderate in plaintiff's favor before giving him the relief demanded. It appears to us, if we sustain the plaintiff's contention in this case, it must be on the theory that he was in position to disavow the contract if it proved detrimental, or accept and insist upon it if it proved beneficial. Equity will not tolerate any such position. Plaintiff ought to have relied and at all times insisted upon the performance of the contract by the defendant, and been ready to perform his part of it; or else he should have promptly disaffirmed and rejected it upon the discovery of the alleged defect. He could

not keep the trade suspended indefinitely, so as to avail himself of a rise in the value of the property, or relieve himself from loss by rescinding in the event of its depreciation. *Hoyt v. Tuxbury*, 70 Ill. 331; *Simpson v. Atkinson* (Minn.) 39 N. W. Rep. 323. The case of *Hoyt v. Tuxbury*, *supra*, is in facts very like the case at bar, and the court in that case held there was an abandonment of the contract. The rule, time and again announced by all the authorities, is that a party cannot call, as a matter of right, upon a court of equity to specifically enforce a contract; that its exercise rests in the sound discretion of the court in view of the contract of the parties and the surrounding circumstances. A party demanding its exercise is bound to show he himself has always been ready, willing, and eager to perform on his part. "Where the contract is in any wise unilateral," says Fry on Specific Performance (section 732), "as, for instance, in the case of an option to purchase a right of renewal or any other condition in favor of one of the parties, and not of the other, then any delay in the party in whose favor the contract is binding is looked at with especial strictness. On this principle the delay of the purchaser in deciding whether or not he will accept the title is an injustice, because the purchaser can enforce the contract as against the vendor, whether the title be good or bad, whereas the vendor can only do so in case of a good title." The same author, in section 737, is made to say: "And, where one party to the contract has given notice to the other party that he will not perform it, acquiescence in this by the other party, by a comparatively brief delay in enforcing his right, will be a bar." In the case of *Green v. Covillard*, 10 Cal. 317, the following language is used: "From the foregoing, which is but a concise statement of the principle, it may be gathered that, while time is not of the essence of the contract ordinarily, yet in every case it will devolve upon the

party seeking relief to account for his delay; and if there are circumstances showing culpable delay on his part, or if the length of time which has been permitted to intervene, together with other circumstances, raise the presumption of an abandonment of the contract, or if the property has greatly advanced in value in the meantime, and the purchaser has laid by, apparently for the purpose of taking advantage of this circumstance, he will not be entitled to a decree in his favor." See, also, *Boyce v. McCulloch*, 3 Watts & S. 429; *Falls v. Carpenter*, 1 Dev. & B. Eq. 237; *Fowler v. Marshall*, 29 Kan. 475; *Morse v. Seibold* (Ill. Sup.) 35 N. E. Rep. 369; *Davies v. Beadle*, 37 Iowa 390; *Parsons v. Gilbert*, 45 Iowa 33. For the reasons indicated, we think the court was in error in decreeing a specific performance of the contract. A great number of cases have been cited upon the question of marketable title, tender, etc.; but, in view of the disposition made of the case, it is not necessary to refer to them. The intervener does not appeal, and we have no occasion to consider his claim. The decree of the District Court is reversed, and cause remanded for decree in harmony with this opinion.— *Reversed.*